ORIGINAL

Approved: _____
JACOB H. GUTWILLIG
Assistant United States Attorney

Before: THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- v. -

UMAR CREDLE,
SHAWN DAWKINS, and
BYRON BARBER,

                              Defendants.

- - - - - - - - - - - - - - - - - -X

**19MAG .3558**

SEALED COMPLAINT

Violations of
18 U.S.C. §§
1344, 1349 and 2,
1028A and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

DANIEL ALESSANDRINO, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Mail Fraud and Bank Fraud)

1. From at least in or about July 2018 up to and including at least in or about December 2018, in the Southern District of New York and elsewhere, UMAR CREDLE, SHAWN DAWKINS, and BYRON BARBER, the defendants, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to commit mail fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1341.

2. It was a part and an object of the conspiracy that UMAR CREDLE, SHAWN DAWKINS, and BYRON BARBER, the defendants, and others known and unknown, knowingly and willfully, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did cause to be sent and delivered by the

United States Postal Service, and did cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom, such matters and things, and did cause to be delivered by mail and such carriers, according to the directions thereon, and at the places at which they were directed to be delivered by the person to whom they were addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

3. It was further a part and an object of the conspiracy that UMAR CREDLE, SHAWN DAWKINS, and BYRON BARBER, the defendants, and others known and unknown, knowingly and willfully would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Bank Fraud)

4. From at least in or about July 2018 up to and including at least in or about December 2018, in the Southern District of New York and elsewhere, UMAR CREDLE, SHAWN DAWKINS, and BYRON BARBER, the defendants, would and did knowingly and willfully execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution insured by the Federal Deposit Insurance Corporation (the "FDIC"), by means of material false and fraudulent pretenses, representations, and promises, to wit, CREDLE, DAWKINS, and BARBER, applied for fraudulent loans using personal identifying information of victims and deposited the proceeds into bank accounts, also in certain victims' names and using their personal identifying information, controlled by CREDLE, DAWKINS, BARBER, and others known and unknown.

(Title 18, United States Code, Sections 1344 and 2.)

COUNT THREE
(Aggravated Identity Theft)

5.  From at least in or about July 2018 up to and including at least in or about December 2018, in the Southern District of New York and elsewhere, UMAR CREDLE, SHAWN DAWKINS, and BYRON BARBER, the defendants, did knowingly transfer, possess, and use, without lawful authority a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, during and in relation to the bank fraud charged in Count Three of the Complaint (i) DAWKINS and BARBER deposited checks and opened bank accounts using the personal identifying information of certain victims and (ii) CREDLE used a debit card held in the name of Victim-10, see infra ¶ 10, to make purchases on his own behalf.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

**Overview**

6.  As set forth in greater detail below, I, and other law enforcement officers, have been investigating a fraud scheme that has been undertaken in Manhattan, New York, and elsewhere, between in or about July 2018 and in or about December 2018 (the "Fraud Scheme"). Based on my involvement in this investigation, my review of law enforcement reports, and my review of surveillance videos and photographs, among other sources, I have learned that the Fraud Scheme was perpetrated by UMAR CREDLE, SHAWN DAWKINS, and BYRON BARBER, as well as others known and unknown. In perpetrating this fraud, CREDLE, DAWKINS, and BARBER, the defendants, as well as others known and unknown, applied for the fraudulent loans from a financial institution ("Financial Institution-1") over the phone using victims' personal identifying information. After Financial Institution-1 approved the respective loan and mailed an official check to the respective victim's address, CREDLE, DAWKINS, BARBER, and others known and unknown, intercepted the respective check. Subsequently, after fraudulently obtaining the check, CREDLE, DAWKINS, BARBER, and others known and unknown, using false identification documents, opened a bank account, using the respective victim's personal identifying information, in a branch of a second financial institution ("Financial Institution-2") and deposited the fraudulently obtained check as initial funding in the newly opened account. Subsequently, CREDLE, DAWKINS, BARBER, and others known and unknown, called

3

Financial Institution-2 to increase withdrawal limits on the respective newly opened account and began withdrawing cash via Automated Teller Machine ("ATM").

7. From my review of publicly available materials, as well as my training and experience and involvement with this investigation, I know that each of Financial Institution-1 and Financial Institution-2 is insured by the FDIC.

8. From approximately in or about July 2018 through December 2018, UMAR CREDLE, SHAWN DAWKINS, and BYRON BARBER, the defendants, as well as others known and unknown, conspired to deposit approximately 9 fraudulent checks, defrauding approximately 12 victims, with a total loss actual loss amount of approximately $151,389.74.

## THE FRAUD

9. Based on my participation in this investigation, my conversations with other law enforcement officers and other individuals (including victims), and my review of documents (including bank records and emails), I have learned the following, among other things:

### Victim-1

a. On or about July 26, 2018, at approximately 1:00 p.m., BYRON BARBER, the defendant, along with an unknown female ("UF-1"), entered a branch of Financial Institution-2 and opened a bank account using the personal identifiers of a particular victim ("Victim-1"). To fund the account, upon opening it, BARBER and UF-1 deposited a check valued at approximately $9,000 issued by Financial Institution-1 ("Check-1").

b. On or about July 27, 2018, at approximately 11:30 a.m., SHAWN DAWKINS, the defendant, entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $6,700 from a bank account held in the name of Victim-1.

c. On or about July 28, 2018, at approximately 11:56 a.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $760 from a bank account held in the name of Victim-1. The withdrawal was funded by Check-1, referenced *supra* ¶ 11(a).

4

Victim-2

a. On or about July 26, 2018, at approximately 6:00 p.m., BARBER, along with UF-1, entered a branch of Financial Institution-2 and opened a bank account using the personal identifiers of a second particular victim ("Victim-2"). To fund the account, upon opening it, BARBER and UF-1 deposited a check valued at approximately $25,000 issued by Financial Institution-1.

b. On or about July 27, 2018, at approximately 11:30 a.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $1,100 from a bank account of Victim-2.

c. On or about July 27, 2018, at approximately 12:30 p.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $5,000 from a bank account held in the name of Victim-2.

d. On or about July 28, 2018, at approximately 3:35 p.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $5,000 from a bank account held in the name of Victim-2.

e. On or about July 29, 2018, at approximately 3:35 p.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $5,460 from a bank account held in the name of Victim-2.

f. On or about July 30, 2018, at approximately 10:30 a.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $6,750 from a bank account held in the name of Victim-2.

Victim-3

a. On or about July 28, 2018, at approximately 1:31 p.m., DAWKINS entered a branch of Financial Institution-2 and deposited a check valued at approximately $14,800 in the name of a third particular victim ("Victim-3") issued by Financial Institution-1.

5

Victim-4

a.  On or about July 31, 2018, an unknown individual called Financial Institution-1's loan department, and applied via phone for a $21,500 loan using the personal identifiers of a fourth particular victim ("Victim-4"). The loan was approved and, on or about August 1, 2018, an official check issued by Financial Institution-2 was mailed to a particular address located in Manhattan, New York, arriving on or about August 2, 2018.

b.  On or about August 9, 2018, at approximately 1:15 p.m., an unknown co-conspirator ("CC-1") entered a branch of Financial Institution-2 and opened a bank account using the personal identifiers of Victim-4. To fund the account, upon opening it, CC-1 deposited a check valued at approximately $21,500, see supra Victim-4 ¶ a, issued by Financial Institution-1.

c.  On or about August 10, 2018, at approximately 11:15 a.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $4,600 from a bank account held in the name of Victim-4.

d.  On or about August 10, 2018, at approximately 1:40 p.m., DAWKINS entered a particular department store ("Department Store-1"), located in Manhattan, New York, and completed two purchases totaling approximately $2,166.62, using a debit card issued by Financial Institution-2 held in the name of Victim-4.

> i.  On a "client form" completed following the purchase, DAWKINS provided a particular phone number, which is a call number previously provided by DAWKINS to the NYPD.
>
> ii. On or about August 18, 2018, at approximately 2:40 p.m., UMAR CREDLE, the defendant, and an associate ("CC-2"), entered Department Store-1 and exchanged a pair of shoes valued at approximately $795. The shoes originally were purchased by DAWKINS on August 10, 2018, using a debit card issued by Financial Institution-2 held in the name of Victim-4.

6

    e. On or about August 11, 2018, at approximately 12:10 p.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $2,960 from a bank account held in the name of Victim-4.

    f. On or about August 12, 2018, at approximately 10:05 a.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $6,000 from a bank account held in the name of Victim-4.

### Victim-5

    a. On or about August 2, 2018, at approximately 12:00 p.m., CREDLE entered a particular department store ("Department Store-2"), located in Manhattan, New York, and completed a purchase totaling approximately $1,388.16, using a credit card issued in the name of a fifth particular victim ("Victim-5").

### Victim-6

    a. On or about August 4, 2018, at approximately 12:00 p.m., BARBER entered a branch of Financial Institution-2 and opened a bank account using the personal identifiers of a sixth particular victim ("Victim-6"). To fund the account, upon opening it, BARBER and UF-1 deposited a check valued at approximately $30,000 issued by Financial Institution-1.

    b. On or about August 7, 2018, at approximately 1:28 p.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $4,500 from a bank account held in the name of Victim-6.

    c. On or about August 7, 2018, at approximately 2:00 p.m., DAWKINS entered Department Store-1, located in Manhattan, New York, and completed a purchase totaling approximately $2,286.38, using a debit card issued from Financial Institution-2 in the name of Victim-6.

    d. On or about August 9, 2018, at approximately 6:45 p.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $7,580 from a bank account held in the name of Victim-6.

    e. On or about August 9, 2018, at approximately 7:55 p.m., DAWKINS entered a branch of Financial Institution-2

and withdrew, via ATM, approximately $940 from a bank account held in the name of Victim-6.

    f. On or about August 10, 2018, at approximately 12:10 p.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $2,600 from a bank account held in the name of Victim-6.

### Victim-7

    a. On or about August 4, 2018, at approximately 2:15 p.m., BARBER entered a branch of Financial Institution-2 and opened a bank account using the personal identifiers of a seventh particular victim ("Victim-7"). To fund the account, upon opening it, BARBER and UF-1 deposited a check valued at approximately $15,000 issued by Financial Institution-1.

    b. On or about August 7, 2018, at approximately 1:00 p.m., DAWKINS entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $8,860 from a bank account held in the name of Victim-7.

### Victim-8

    a. On or about August 10, 2018, at approximately 3:30 p.m., DAWKINS was observed at Department Store-2, and completed a purchase totaling approximately $4,039.27 using a credit card issued by a particular financial institution ("Financial Institution-3") held in the name of an eighth particular victim ("Victim-8").

    b. On or about August 10, 2018, at approximately 4:00 p.m., DAWKINS entered Department Store-2 and completed two purchases totaling approximately $1,796.44, using a credit card issued by Financial Institution-3 held in the name of Victim-8.

      i. On a "client form" completed following the purchase, DAWKINS provided a particular phone number, which is a call number previously provided by DAWKINS to the NYPD.

      ii. Following this purchase, at approximately 3:57 p.m., DAWKINS exited Department Store-2 and was observed entering a black

8

Honda Accord that was registered to CREDLE.

### Victim-9

a. On or August 13, 2018, at approximately 5:14 p.m., BARBER entered a branch of Financial Institution-2 and opened a bank account using the personal identifiers of a ninth particular victim ("Victim-9"). To fund the account, upon opening it, BARBER deposited a check valued at approximately $35,000 issued by Financial Institution-1.

b. On or about August 14, 2018, at approximately 5:25 p.m., CREDLE entered a branch of Financial Institution-2 and withdrew, via ATM, approximately $3,900 from a bank account held in the name of Victim-9.

### Victim-10

c. On or about August 25, 2018, at approximately 4:45 p.m., CREDLE, along with an unknown male ("UM-1"), entered Department Store-1 and completed a purchase totaling approximately $2,863.42, using a credit card issued by a particular financial institution ("Financial Institution-4") held in the name of a tenth particular victim ("Victim-10").

### Victim-11

a. On or about September 5, 2018, at approximately 5:24 p.m., CREDLE entered Department Store-1 and completed a purchase totaling approximately $5,117.13, using a credit card issued by a particular financial institution ("Financial Institution-5") held in the name of an eleventh particular victim ("Victim-11"). Security personnel from Department Store-1 recognized CREDLE from prior incidents and attempted to apprehend him, at which point CREDLE shoved a female loss prevention officer and fled.

WHEREFORE, the deponent respectfully requests that warrants be issued for the arrest of UMAR CREDLE, SHAWN DAWKINS, and BYRON BARBER, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

_____
DANIEL ALESSANDRINO
Detective
New York City Police Department

Sworn to before me this
10th day of April, 2019

_____
THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK